UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TEEN RANCH, et al.,

        Plaintiffs,

                                        File No.  5:04-CV-32

v.

                                        HON. ROBERT HOLMES BELL

MARIANNE UDOW, et al.,

        Defendants.

_____/

**O P I N I O N**

      This action, which involves the provision of youth residential services by a faith-based

organization under contract with the State, is before the Court on the parties' cross-motions

for summary judgment.  For the reasons that follow judgment will be entered in favor of the

State Defendants.

**I.**

      Plaintiffs in this action are Teen Ranch, Matthew J. Koch, its Chief Executive Officer,

and Mitchell E. Koster, its Chief Operating Officer (collectively referred to as "Teen

Ranch").  Teen Ranch is a non-denominational Christian faith-based organization that has

provided residential care for delinquent, neglected, abused, and emotionally troubled youth

between the ages of 11 and 17 since 1966.

      Defendants are Marianne Udow, Director of the Michigan Family Independence

Agency ("FIA"), Musette A. Michael, Interim Director of the FIA, and Debora Buchanan,

Manager of the Purchased Care Division of the FIA (collectively referred to as the "FIA" or the "State Defendants").  The FIA is a department of Michigan state government that is responsible for administering Michigan's public assistance, child and family welfare programs.  M.C.L. § 400.1.  The FIA is responsible for providing care and supervision to abused, neglected and delinquent children who have been committed to or placed in the care of the FIA through the state courts.  M.C.L. §§ 400.114-400.115e.  The FIA is authorized to place these children in out-of-home care and may contract with private organizations to provide these services.  M.C.L. § 400.115(a); M.C.L. § 400.115a(1)(f).

Each year the FIA takes in approximately 3000 children for residential care. (Buchanan Dep. at 9).  The FIA contracts with 96 private child care agencies to provide residential services to the youth for stays averaging four to twelve months.  At least 35 of the providers are faith-based organizations.  (Buchanan Aff. ¶ 6).  According to Buchanan, Teen Ranch is the only provider that incorporates its religious beliefs and teaching into the services funded under its contract with the FIA.  (Buchanan Aff. ¶ 6).

When a child is made a state ward and placed with the FIA for care and supervision, the FIA does not offer the child a list of placement choices.  Instead, the FIA places the child in one of its residential  programs according to what the FIA believes is in the best interests of the child.  The placement is determined by a computerized grid.  The FIA obtains information about the child's history and treatment needs, inputs that information into the computer system, and the computer system finds the best matches between the youth's needs

2

and the services provided by the various programs.   Generally, the FIA places the child at

the agency that has the best treatment match.  If two facilities are equal, then the FIA will

place the child at the agency that has waited the longest for a placement.  (Slottke Dep. at pp.

5-35).  Juvenile wards of the state receive assistance from a caseworker, a lawyer/guardian

ad litem and parents or a guardian.   (Buchanan Dep. at 112-119; Udow Dep. at 25-26).

The FIA's last contract extension with Teen Ranch expired on October 1, 2003.  In

November 2003, after an investigation of the Teen Ranch program, the FIA issued a

moratorium against further placements at Teen Ranch.  The FIA had a number of initial

concerns, but the incorporation of religious practices into the programming at Teen Ranch

emerged as the FIA's primary concern.

In December 2003, Teen Ranch addressed FIA's concerns regarding its religious

practices as follows:

> The mission statement of Teen Ranch states, "*providing hope to young people and families through life changing relationships and experiences from a Christian perspective*."  This mission, and our interpretation of this mission, will not change, be sacrificed, nor will it be compromised.
>
> Teen Ranch, as policy, does not "force" youth to attend religious services, although it is encouraged and we believe to be part of an effective treatment program.  Alternatives are provided for the children who wish not to attend religious services, such as a personal academic study time (if desired), letter writing home, recreational time in the gymnasium, or watch television until the other youth return home.
>
> However, incorporating religious teachings into on-going daily activities of youth and their treatment plans touches at the core of why we were founded, why we are here today, and why we will continue to include such programming for children in our care.

(Amendment of Corrective Action Plan, Def. Ex. EE at 8) (emphasis in original).

Although there are many disputed facts concerning the specific manner in which religion is incorporated into the Teen Ranch program, Teen Ranch acknowledges that it is overtly and unapologetically a Christian facility with a Christian worldview that hopes to touch and improve the lives of the youth it serves by encouraging their conversion to faith in Christ, or assisting them in deepening their pre-existing Christian faith.  (Policy Directive at 6, Def. Ex. DD).  Teen Ranch expresses its religious beliefs through voluntary prayer, devotions, church attendance and faith discussions.  (Pl. Statement of Undisputed Facts ¶ 5).

By letter dated January 9, 2004, the FIA informed Teen Ranch that while it was supportive of faith-based organizations, "[t]he incorporation of faith specific tenets into treatment is not permitted by state and federal law," and that "if Teen Ranch is unwilling to modify its current practices regarding the imposition of its religious beliefs into the daily treatment and service plan activities, FIA is unable to approve the corrective action plan and rescind the moratorium."  (Def. Ex. B).

Teen Ranch independently adopted a procedure that required wards to be informed of the religious nature of Teen Ranch prior to being placed there, and giving the ward an opportunity to object to a Teen Ranch placement both before and after the actual placement. Although the FIA did place a few youth at Teen Ranch after it announced the moratorium in December 2003, the FIA reinstated the full moratorium against placements at Teen Ranch after this Court denied Teen Ranch's motion for preliminary injunction.

Because most of Teen Ranch's residents were state placements, the moratorium has had a profound financial effect on Teen Ranch.  Since the moratorium was entered Teen Ranch has had to close several of its programs and to sell half of its residential facilities.  (Pl. Br. in Supp. of S.J. at 1).

Teen Ranch filed this action asserting four constitutional claims – violation of free exercise, free speech, due process, and  equal protection, and one statutory claim – violation of the right to free exercise under 42 U.S.C. § 604a.  This Court previously denied Teen Ranch's motion for a preliminary injunction.  This matter is currently before the Court on the parties' cross-motions for summary judgment.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If the moving party carries its burden of showing there is an absence of evidence to support a claim then the non-moving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient to create a genuine

5

issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III.

Although a variety of legal theories and factual issues have been raised in the course of this litigation, this case is, at its heart, about the tension between the Free Exercise Clause and the Establishment Clause of the First Amendment.[1]  These two clauses are frequently in tension. *See Locke v. Davey*, 540 U.S. 712, 718-19 (2003). Teen Ranch wants to be free to exercise its religious faith without interference from the State, and the FIA wants to avoid violating the Establishment Clause by subsidizing a particular religious viewpoint.

The Supreme Court articulated a test for determining when state funding violates the Establishment Clause in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and refined the test in *Agostini v. Felton*, 521 U.S. 203, 221-23 (1997). Under the resulting *Lemon/Agostini* test, the Court must consider whether the funding has "the purpose of advancing or inhibiting religion" and whether the funding has "the effect of advancing or inhibiting religion."

---

[1]The First Amendment provides in part that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof . . . . " U.S. CONST. Amend. 1. The Establishment and Free Exercise Clauses have been made applicable to the States by incorporation into the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

*DeStefano v. Emergency Housing Group, Inc.*, 247 F.3d 397, 406 (2nd Cir. 2001) (quoting *Mitchell*, 120 S. Ct. 2559 (O'Connor, J., concurring in the judgment)).  To answer the second question of effect, the court must consider whether the funding results in "governmental indoctrination," whether it defines its participants by reference to religion, and whether it creates excessive government entanglement with religion.  *Id.  See also Freedom from Religion Foundation, Inc. v. McCallum*, 179 F. Supp. 2d 950, 966 (W.D. Wis. 2002), *on reconsideration in part*, 214 F. Supp. 2d 905 (W.D.Wis. 2002), *aff'd*, 324 F.3d. 880 (7th Cir. 2003).  "These same factors can in most situations be evaluated to answer what is often thought to be a separate question, whether a practice amounts to an unconstitutional government 'endorsement' of religion." *DeStefano*, 247 F.3d at 406.

The tension in this case between the Establishment Clause and the Free Exercise Clause is focused by § 220 of the State appropriations bill, 2004 P.A. 344 (the "Public Act"), that governs the FIA's contracts with faith-based organizations.[2]  Section 220 has been a part of every FIA appropriations bill since 2001.  *See*, *e.g.*, 2003 P.A. 172 § 220.  Section 220 provides that "the department shall ensure that **no funds provided directly** to institutions or organizations to provide services and administer programs **shall be used or expended for any sectarian activity**, including sectarian worship, instruction, or proselytization." 2004

---

[2]Defendants' contention that Plaintiffs did not allege a violation of § 220 of the Public Act is addressed in the discussion of Count V in Section VIII of this Opinion.  The Court analyzes § 220 of the Public Act here, not as a separate claim for relief, but as the factual and legal background that forms the foundation for the parties' constitutional claims.

P.A. 344, § 220(1) (emphasis added).  If an individual who receives services from the FIA objects to the religious character of the organization providing services, the FIA will provide services from an alternative provider.  *Id.* at § 220(2).  "The department **shall not disqualify** faith-based organizations **solely on the basis of the religious nature of their organization or their guiding principles or statements of faith**."  *Id.* at § 220(3) (emphasis added). Finally, the FIA is required to follow the guidelines related to faith-based involvement found in 42 U.S.C. § 604a.[3]

---

[3]The full text of § 220 reads as follows:

(1) In contracting with faith-based organizations for mentoring or supportive services, and in all contracts for services, the department shall ensure that no funds provided directly to institutions or organizations to provide services and administer programs shall be used or expended for any sectarian activity, including sectarian worship, instruction, or proselytization.

(2) If an individual requests the service and has an objection to the religious character of the institution or organization from which the individual receives or would receive services or assistance, the department shall provide the individual within a reasonable time after the date of the objection with assistance or services and which are substantially the same as the service the individual would have received from the organization.

(3) The department shall ensure that faith-based organizations are able to apply and compete for services, programs, or contracts that they are qualified and suitable to fulfill.  The department shall not disqualify faith-based organizations solely on the basis of the religious nature of their organization or their guiding principles or statements of faith.

(4) The department shall follow guidelines related to faith-based involvement established in section 104 of title I of the personal responsibility and work opportunity reconciliation act of 1996, 42 USC § 604a.

Public Act 334 (2004).

The federal statute referenced in §220(4) is the charitable choice section of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), 42 U.S.C. § 604a. The guidelines in § 604a are very similar to the provisions of § 220. The federal law expressly prohibits direct funding of sectarian worship, instruction, or proselytization;[4] requires the state to provide alternative services if the recipient objects to the religious character of the organization;[5] prohibits the state from discriminating against a religious organization on the basis of its religious character so long as the programs are

---

[4]Section 604a(j) provides:

No funds provided directly to institutions or organizations to provide services and administer programs under subsection (a)(1)(A) of this section shall be expended for sectarian worship, instruction, or proselytization.

42 U.S.C. § 604a(j).

[5]Section 604a(e)(1) provides:

If an individual described in paragraph (2) has an objection to the religious character of the organization or institution from which the individual receives, or would receive, assistance funded under any program described in subsection (a)(2) of this section, the State in which the individual resides shall provide such individual (if otherwise eligible for such assistance) within a reasonable period of time after the date of such objection with assistance from an alternative provider that is accessible to the individual and the value of which is not less than the value of the assistance which the individual would have received from such organization.

42 U.S.C. § 604a(e)(1).

implemented consistent with the Establishment Clause;[6] and enables the organization to retain its religious character.[7]

The Public Act, together with 42 U.S.C. § 604a, have changed some of the rules regarding public funding of religious organizations:

> Although religious organizations have been eligible to receive government aid under certain government programs for many years, charitable choice is unique in that it does not require participating faith-based organizations to "secularize" themselves as a condition to receiving public funds. To the contrary, the charitable choice statute allows publicly funded religious organizations to retain their religious character and to employ their religious faith in carrying out secular social service programs, as long as the programs are administered in conformance with the establishment clause of the First Amendment.

*McCallum*, 179 F. Supp. 2d at 982.

---

[6]42 U.S.C. § 604a(c) provides:

In the event a State exercises its authority under subsection (a) of this section, religious organizations are eligible, on the same basis as any other private organization, as contractors to provide assistance, or to accept certificates, vouchers, or other forms of disbursement, under any program described in subsection (a)(2) of this section so long as the programs are implemented consistent with the Establishment Clause of the United States Constitution. Except as provided in subsection (k) of this section, neither the Federal Government nor a State receiving funds under such programs shall discriminate against an organization which is or applies to be a contractor to provide assistance, or which accepts certificates, vouchers, or other forms of disbursement, on the basis that the organization has a religious character.

[7]42 U.S.C. § 604a(d)(1) provides:

A religious organization with a contract described in subsection (a)(1)(A) of this section, or which accepts certificates, vouchers, or other forms of disbursement under subsection (a)(1)(B) of this section, shall retain its independence from Federal, State, and local governments, including such organization's control over the definition, development, practice, and expression of its religious beliefs.

Both § 220 of the Public Act and 42 U.S.C. § 604a make important distinctions based upon whether funds are provided "directly" to the faith-based organization. Counsel for Teen Ranch candidly acknowledged to this Court during oral argument that if its program is directly funded by the State, then the State could not fund its program without violating the Establishment Clause and the Public Act. If, however, the funding is "indirect," then the State is not permitted under the Public Act to condition funding on the elimination of Teen Ranch's religious practices.

The State contends that its funding of Teen Ranch is direct because it contracts with and pays the funds directly to Teen Ranch. (Def. Br in Reply at 4-5). Contrary to the State Defendants' assertions, it appears that most courts would agree that funding is not "direct" simply because it is paid directly from the State to the faith-based organization rather than by the individual through a voucher, coupon or certificate. The plurality of the Supreme Court noted in *Mitchell v. Helms*, 530 U.S. 793 (2000), that although previous cases had emphasized the distinction between direct and indirect aid, more recent cases have addressed the purpose of preventing subsidization of religion by focusing on the principle of "private choice." *Id.* at 815-16 (Thomas, J., plurality). "Although the presence of private choice is easier to see when the aid literally passes though the hands of individuals . . . there is no reason why the Establishment Clause requires such form." *Id.* at 816. *See also McCallum*, 324 F.3d at 882 ("so far as the policy of the establishment clause is concerned, there is no difference between giving the voucher recipient a piece of paper that directs the public

11

agency to pay the service provider and the agency's asking the recipient to indicate his preference and paying the provider whose service he prefers."); *McCallum*, 179 F. Supp. 2d at 970 ("A plurality of the Supreme Court has held that as long as the individual selects the publicly funded program freely, thus making the funding truly indirect, it is irrelevant whether the funding passes through the hands of the individual first or goes directly to the selected program.").

The Supreme Court has repeatedly upheld programs against Establishment Clause challenges where the state funding of the programs arose out of "true private choice" or the "genuine and independent choices of private individuals." *Zelman* v. *Simmons-Harris*, 536 U.S. 639, 649 (2002) (citing *Mueller v. Allen*, 463 U.S. 388 (1983); *Witters v. Washington Dept. of Servs. for Blind*, 474 U.S. 481 (1986); *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1 (1993)). "Under our Establishment Clause precedent, the link between government funds and religious training is broken by the independent and private choice of recipients." *Locke*, 540 U.S. at 719. "[W]hen public funding flows to faith-based organizations solely as a result of the 'genuinely independent and private choices of individuals,' the funding is considered indirect." *McCallum*, 179 F. Supp. 2d at 970 (citing *Agostini v. Felton,* 521 U.S. 203, 226 (1997)). "When a program receives indirect funding, it is the individual participant, and not the state, who chooses to support the religious organization, reducing the likelihood that the public funding has the primary effect of advancing religion in violation of the establishment clause." *Id.*

It is evident from these cases that the critical feature distinguishing direct funding from indirect funding is whether the individual has selected the program through true private choice. The Establishment Clause is not violated if the state money goes to a religious organization only as a result of the genuinely independent and private choices of an individual. In other words, private choice transforms constitutionally troublesome "direct" funding into constitutionally unobjectionable "indirect" funding.

Although many issues have been raised by the parties, they all boil down to the single issue of whether the ability of youth to opt out of the Teen Ranch program pursuant to § 220(2) of the Public Act based on its religious character gives the youth true private choice so as to make the funding of the religious programs at Teen Ranch indirect rather than direct.[8]

The FIA points out that the ward does not get to choose where he is placed. Both the initial and the ultimate placement decision lies with the state. The FIA also contends that state wards are too young, vulnerable, and traumatized to be able to make the ability to opt out of a religious placement an exercise of true private choice.

---

[8]After the initiation of the moratorium, Teen Ranch adopted a procedure that required wards to be informed of the religious nature of Teen Ranch prior to being placed at Teen Ranch, and provided the ward an opportunity to refuse placement at Teen Ranch. Although Teen Ranch's proposed procedure is laudable, this Court will focus on the requirements of the Public Act, rather than assuming that the State must or will follow the procedures outlined by Teen Ranch.

Teen Ranch contends that the wards have the private choice on whether to attend Teen Ranch, a choice that is protected by state and federal statutes.  Teen Ranch also rejects the State's assertion that the wards are too vulnerable to make a choice because there is no evidence that wards are particularly shy, retiring, or too fearful to reject placement at Teen Ranch or to demand relocation if they form an objection to the religious programming there, and because each ward has a caseworker, a lawyer/guardian ad litem, and a parent or guardian to assist them in voicing and protecting their interests.

Regardless of whether state wards are particularly vulnerable, they are children.  The Court believes that this fact cannot be ignored as the Court considers whether an opt-out provision is sufficient to make the ward's choice "a true private choice."

All of the cases where the issue of private choice has been held sufficient to avoid Establishment Clause concerns have involved a variety of options.  For example, in *McCallum* criminal parolees were offered enrollment in one of several private halfway houses under contract with the state as an alternative to being sent back to prison.  The plaintiffs challenged the state's funding of Faith Works, Milwaukee, Inc., a faith-based, long-term alcohol and other drug addiction treatment program, that incorporated Christianity into its treatment program.  The district court found that "offenders participate in Faith Works as a result of genuinely independent, private choice and that this choice makes the Department of Corrections contract with Faith Works an indirect program that does not convey a message of endorsement." *McCallum*, 214 F. Supp. 2d at 905.  The district court

14

accordingly concluded that funding of Faith Works by the Department of Corrections did not violate the Establishment Clause.  *Id.* at 907-08.  Even though *McCallum* dealt with adult offenders who had a clear choice between a religious program and a variety of secular programs, the district court still found that it was a close question.  214 F. Supp. 2d at 907. In affirming, the Seventh Circuit noted that the state was eager to have Faith Works on its "menu of halfway-house choices."  *McCallum*, 324 F.3d at 883.  The court observed that most private schools in this country are parochial schools, and that accordingly, the fact that "most of the halfway houses with which the state has contracts are secular makes this an easier case than the school voucher case."  *Id*

The issue of true private choice was discussed most recently in *American Jewish Congress v. Corporation for National and Community Service,* 399 F.3d 351 (D.C. Cir. 2005).  In that case the court held that providing education awards to AmeriCorps participants who taught in religious schools did not violate the Establishment Clause.  In arriving at this determination the court noted that there were "numerous" teaching positions in public and private secular schools and that no participant who wanted to teach in a secular school was impermissibly channeled to a religious school.  *Id.* at 358.  "When enough non-religious options exist, those participants who choose to teach in religious schools do so only as a result of their own genuine and private choice."  *Id.*

In this case the wards of the State are not presented with any alternatives.  They are presented with one placement by the State and they have the ability to opt out of that

placement if they object to the religious nature of the program.  In that event the State will place the child in an alternative program.  Although the children have the ability to opt out of a religious program, they do not have the ability to choose or reject a religious program from a menu of secular and religious programs.

The Court is aware of no case that has examined the issue of whether an opt-out provision is sufficient to constitute "true private choice." There are no cases regarding the sufficiency of an adult's ability to opt out, much less a case about children.  The Court is mindful that more care must be taken when it is dealing with children.  In finding private, independent choice and a lack of state endorsement of religion in *McCallum*, the district court distinguished the adult offenders who chose to participate in the Faith Works program from children who might be more impressionable or susceptible to indoctrination.  214 F. Supp. 2d at 915-16, 919 (citing *School Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 307 (1963) (Goldberg, J., concurring).

Although the Court is hesitant to suggest whether an opt-out program will ever satisfy the true choice required to avoid Establishment Clause problems, the Court is satisfied that where, as here, the State selects the juvenile state ward's residential placement, the ward's ability to opt out of placement at a faith-based institution with religious programming is not sufficient to avoid Establishment Clause problems because State placements at Teen Ranch would advance or endorse a particular religious viewpoint.

Up to this point the Court has been focusing on the choice to opt out of the Teen Ranch program.  In the early stages of this case there was significant discussion as to whether participation in religious activities at Teen Ranch was voluntary.  The State contended that Teen Ranch coerced wards to participate in religious activities.  Teen Ranch denied the accusation and asserted that all participation in religious activities was voluntary because residents had the option of not participating in prayer, devotions, and church, and no negative consequences attached to their non-participation in these religious activities.

It appears that voluntary participation in the day-to-day religious activities at Teen Ranch is no longer the focus of the parties' dispute.  Nevertheless, because Teen Ranch continues to emphasize that the youth in its program have the option of not participating in prayers before meals, devotions during the week, church attendance, or discussions concerning Christian faith, the Court feels constrained to consider whether the ability to opt out of participation in religious activities is sufficient to save the Teen Ranch program from Establishment Clause concerns.  The Court concludes that it is not.

As the Supreme Court has repeatedly held in connection with the school prayer cases, the ability to withdraw from religious activities does not make a program non-religious:

> Just as in *Engel v. Vitale*, 370 U.S., at 430, 82 S.Ct., at 1266, and *School Dist. of Abington v. Schempp*, 374 U.S., at 224-225, 83 S.Ct., at 1572-1573, where we found that provisions within the challenged legislation permitting a student to be voluntarily excused from attendance or participation in the daily prayers did not shield those practices from invalidation, the fact that attendance at the graduation ceremonies is voluntary in a legal sense does not save the religious exercise.

*Lee v. Weisman*, 505 U.S. 577, 596 (1992).  As noted in *Lee v. Weisman*, "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Id*. at 592.

> We do not address whether that choice is acceptable if the affected citizens are mature adults, but we think the State may not, consistent with the Establishment Clause, place primary and secondary school children in this position. Research in psychology supports the common assumption that adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention.

*Id*. at 593.  *See also Santa Fe Independent Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000) (holding that school district's policy of permitting student-led, student-initiated prayer at football games violates the Establishment Clause).

In light of the Supreme Court's determination that a student's choice to stand quietly or to remove himself from prayers during graduation or football games will not withstand constitutional scrutiny in the public school setting, it is clear that the ability to choose not to participate in religious activities at Teen Ranch cannot pass constitutional scrutiny.  The pressures that the Supreme Court recognized in the public school setting would inevitably be far greater in a long term residential program where the youth are separated from their parents, deprived of many personal freedoms,  and under the daily supervision and influence of those who are leading the religious activities.

Nothing in this discussion should be construed as a challenge to the sincerity or the efficacy of Teen Ranch's faith-based program.  The only issue is whether an opt-out provision for juvenile state wards assigned to Teen Ranch is true private choice.  The Court

holds that it is not.  Because there is no "true private choice," the State cannot fund placements at Teen Ranch without running afoul of the Public Act and the Establishment Clause.

With this threshold determination that funding is not appropriate under § 220 of the Public Act or the Establishment Clause, the Court will address the five claims alleged in Plaintiffs' complaint.

## IV.

Plaintiffs' first claim alleges a violation of the right to free exercise of religion under the First Amendment of the United States Constitution. Teen Ranch contends that the maintenance of the moratorium violates the Free Exercise Clause[9] because it conditions the receipt of a governmental benefit on Teen Ranch's surrender of its religious beliefs and practices and burdens the free exercise of Plaintiff's religious beliefs without satisfying the strict scrutiny standard.

"The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires."  *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 876-77 (1990).  It also prohibits the government from imposing "special disabilities on the basis of religious views or religious status."  *Id.* at 877.  Thus, the Supreme Court held that conditioning the award of unemployment compensation benefits on the abandonment of conduct required by an individual's religion

---

[9]*See* footnote 1, above.

violates the Free Exercise Clause of the First Amendment. *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136 (1987); *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707 (1981); *Sherbert v. Verner*, 374 U.S. 398 (1963). *See also McDaniel v. Paty*, 435 U.S. 618, 626 (1978 ) (holding that a state constitutional provision barring ministers from holding legislative office violated the Free Exercise Clause).

The *Sherbert v. Verner* line of cases all held that the government could not deny a public benefit based on the workers' religious beliefs. Unlike unemployment benefits or the ability to hold office, a state contract for youth residential services is not a public benefit. The *Sherbert v. Verner* line of cases does not stand for the proposition that the State can be required under the Free Exercise Clause to contract with a religious organization.

More on point is the Supreme Court's decision in *Locke v. Davey*, 540 U.S. 712 (2003), where the Court reviewed a state scholarship program that excluded any student who was pursuing a degree in devotional theology. *Id.* at 715. Although the law was not facially neutral with respect to religion, the Court held that it did not violate the Free Exercise Clause:

> It imposes neither criminal nor civil sanctions on any type of religious service or rite. It does not deny to ministers the right to participate in the political affairs of the community. And it does not require students to choose between their religious beliefs and receiving a government benefit. The State has merely chosen not to fund a distinct category of instruction.

*Id. at* 720-21 (citations omitted).

In *Gary S. v. Manchester School Dist.*, 374 F.3d 15 (1st Cir. 2004), the First Circuit held that the failure to provide federal and state funding for certain special education services provided by private religious schools even though the same services were funded when provided by public schools, did not violate the Free Exercise rights of a disabled child or his parents.  "[I]t is clear there is no federal constitutional requirement that private schools be permitted to share with public schools in state largesse on an equal basis." *Gary S. v. Manchester School Dist.* 374 F.3d 15, 21 (1st Cir. 2004).  "[T]he mere non-funding of private secular and religious school programs does not 'burden' a person's religion or the free exercise thereof." *Id*. at 21-22.

Subsequently, the First Circuit addressed the issue of whether a Maine statute providing that only nonsectarian schools were eligible to receive public funds for tuition violated the Free Exercise Clause or Equal Protection.  The court held that it did not: "*Davey* confirms that the Free Exercise Clause's protection of religious beliefs and practices from direct government encroachment does not translate into an affirmative requirement that public entities fund religious activity simply because they choose to fund the secular equivalents of such activity." *Eulitt v. Maine, Dept. of Educ.*, 386 F.3d 344, 354 (1st Cir. 2004).

There is no question that in the absence of the non-discrimination provisions of the Public Act the State's failure to contract with a particular faith-based organization would not violate the organization's Free Exercise rights.  Teen Ranch's Free Exercise claim accordingly

depends on the State's violation of the Public Act.  This Court has determined above that the

FIA did not violate the Public Act.  In light of this determination, the State Defendants are

entitled to judgment on Plaintiffs' Free Exercise claim.

**V.**

Plaintiffs' second claim alleges a violation of the Free Speech Clause of the First

Amendment.  Plaintiffs contend that FIA's assertion that it will not rescind the moratorium

unless Teen Ranch modifies its current practices of imposing its religious beliefs into its

treatment and service plan activities is blatant viewpoint discrimination.  Plaintiffs cite

*Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819 (1995), in support of

its contention that "[t]he government must abstain from regulating speech when the specific

motivating ideology or the opinion or perspective of the speaker is the rationale for the

restriction."  *Id.* at 829.

In *Rosenberger* the Supreme Court held that a university's denial of funds to an

organization that published a newspaper with a Christian editorial viewpoint amounted to

viewpoint discrimination in violation of the First Amendment.  *Id.* at 832.  As noted in *Locke,*

the unconstitutional viewpoint restriction discussed in *Rosenberger* is limited to cases

involving speech in a public forum.  *Locke*, 540 U.S. at 720 n.3.  The *Locke* Court

distinguished *Rosenberger* on the basis that the state scholarship program was not a forum

for speech.  The purpose of the program was to assist students with the cost of college

education not to "encourage a diversity of views from private speakers."  *Locke*, 124 S. Ct.

at 1312 n.3 (quoting *United States v. Am. Library Ass'n*, 539 U.S. 194, 206 (2003)). "[W]hen

the Government appropriates public funds to establish a program it is entitled to define the

limits of that program." *Rust v. Sullivan*, 500 U.S. 173, 194 (1991) (holding that Free Speech

Clause was not violated by federal regulations prohibiting recipients of federal funding for

family-planning services from engaging in abortion counseling or referral).

A free speech argument was similarly rejected in *McCallum* on the grounds that the

government had not created a forum for speech.  The district court held that Wisconsin's

decision to contract with private entities to deliver drug and alcohol services did not create,

encourage or otherwise facilitate private expression, and accordingly the state could make

a content-based selection of private sector providers without violating the First Amendment.

179 F. Supp. 2d at 979-81.

Plaintiffs attempt to distinguish *Locke* and *McCallum* on the basis that 42 U.S.C.

§ 604a and the State Public Act explicitly give faith-based organizations such as Teen Ranch

the right to express their religious beliefs, thus creating a forum for free speech.  Plaintiffs

suggest that in light of these statutes, this case is governed by *Legal Services Corp. v.

Velasquez*, 531 U.S. 533 (2001).

In *Velasquez* the Supreme Court held that an act prohibiting the use of funding from

the Legal Services Corporation ("LSC") for legal challenges to existing welfare law violated

the First Amendment.  *Id.* at 536-37.  The Court noted that although the purpose of the LSC

program was "not to 'encourage a diversity of views,' the salient point is that, like the

program in *Rosenberger*, the LSC program was designed to facilitate private speech, not to promote a governmental message." *Id.* at 542. By restricting the legal arguments that could be made, the Act unconstitutionally infringed on the private speech of indigent litigants and their attorneys. *Id.* at 546-49. Even in *Velazquez*, however, the Court reiterated that "viewpoint based funding decisions can be sustained in instances in which the government itself is the speaker, or in instances . . . in which the government use[s] private speakers to transmit information pertaining to its own program." 531 U.S. at 541.

The fact that FIA has decided to contract out some of its children's services responsibilities to private providers does not create a forum for private speech. The purpose of contracting for these services is to provide treatment for troubled youth in a residential setting, not to promote the private speech of the providers of that care. Unlike the LSC program discussed in *Velazquez*, the State Public Act is one of those instances in which the government uses private speakers to transmit information concerning the government's own program.

Moreover, even if the Court were to find that the Public Act created a limited forum for speech, that forum is limited to sectarian programs that are not directly funded, i.e., that are chosen by individuals as a matter of "true private choice." Because the Public Act specifically prohibits direct funding of any sectarian activity, it does not create a forum for speech when the participants do not have a true private choice on whether or not to participate in the program.

For all these reasons, the State Defendants are entitled to judgment on Plaintiffs' Free Speech claim.

## VI.

Plaintiffs' third claim alleges a violation of the Due Process Clause of the Fourteenth Amendment.  Plaintiffs contend that the moratorium violates their due process rights because it is vague and fails to provide explicit standards.  Plaintiffs contend there are no standards to guide the FIA in imposing a moratorium, and thus the Defendants' actions are unconstitutionally vague.  *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."); *United Food & Comm'l Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.*, 163 F.3d 341, 358-59 (6th Cir. 1998) ("Due process requires that we hold a state enactment void for vagueness if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion.").

Contrary to Plaintiffs' assertions, the FIA's determination to enter into a moratorium on further placements at Teen Ranch was not a matter of unbridled discretion.  The Public Act contains standards that guide the FIA regarding contracts with faith-based organizations and restricts the FIA from directly funding sectarian activities.  Those standards are not unconstitutionally vague.  Accordingly, the State Defendants are entitled to judgment on Plaintiffs' due process claim.

25

## VII.

Plaintiffs' fourth claim alleges a violation of the Equal Protection Clause[10] of the Fourteenth Amendment. The Equal Protection Clause directs that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1977).

Teen Ranch contends that it is similarly situated to the other private placement facilities that contract with the State and offer similar services, some of which are secular and others which are faith-based.

The FIA has presented unrebutted evidence that it is aware of no other placement facility that incorporates its religious beliefs and teachings into the services funded under its contract with FIA, (Buchanan Dep. at ¶ 6), or that incorporates religion as an integral part of its residential program. Accordingly, it is not similarly situated to the other private placement facilities that contract with the state.

Even if it were similarly situated, under equal protection analysis strict scrutiny is only applied if there is an infringement of a fundamental right or discrimination against a suspect class. Under equal protection analysis, "[i]f a protected class or fundamental right is involved, this Court must apply strict scrutiny, but where no suspect class or fundamental right is implicated, this Court must apply rational basis review." *Midkiff v. Adams County*

---

[10]The Equal Protection Clause guarantees that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV § 1.

*Regional Water District*, 409 F.3d 758, 770 (6th Cir. 2005) (citing *Hadix v. Johnson*, 230
F.3d 840, 843 (6th Cir. 2000)).

Plaintiffs contend that the Defendants' discriminatory treatment is subject to strict
scrutiny because the discriminatory policy infringes First Amendment rights.  Because this
Court has already determined that Plaintiffs do not have a meritorious Free Speech or Free
Exercise claim, their  Equal Protection claim is subject to rational basis scrutiny.

In *Eulitt* the First Circuit found that Maine's reasons for excluding religious schools
from education plans that extend public funding to private schools for the provision of
secular education to Maine students met the rational basis test.  Those reasons included:

> concentrating limited state funds on its goal of providing secular education,
> avoiding entanglement, and allaying concerns about accountability that
> undoubtedly would accompany state oversight of parochial schools' curricula
> and policies (especially those pertaining to admission, religious tolerance, and
> participation in religious activities).

*Eulitt*, 386 F.3d at 356.

In this case the State Defendants' desire to avoid violating the Establishment Clause
through direct funding of a program that incorporates specific religious teaching, worship,
or proselytization, is sufficient to meet the rational basis test.  Accordingly, the State
Defendants are entitled to judgment on Teen Ranch's Equal Protection claim.

## VIII.

Plaintiffs' fifth claim alleges a violation of Teen Ranch's statutory right to free
exercise of religion.  Teen Ranch alleges that the FIA's moratorium on placements at Teen
Ranch violates their rights under 42 U.S.C. § 604a.

27

Defendants contend this Court lacks jurisdiction over any claim based on 42 U.S.C. § 604a because this statute does not create any private rights enforceable in federal court. The statute provides:

> Any party which seeks to enforce its rights under this section may assert a civil action for injunctive relief exclusively in an appropriate State court against the entity or agency that allegedly commits such violation.

42 U.S.C. § 604a(i).

Moreover, by its terms, § 604a applies only to programs that are funded under Title IV-A of the Social Security Act and any other program established or modified under Title I or II of the Social Security Act.  42 U.S.C. § 604a(a)(2).  FIA is funded for a portion of its foster care placement costs under Title IV-E of the Social Security Act, rather than Title IV-A.

Plaintiffs have not rebutted Defendants' argument that § 604a does not apply to its residential placement programs.  Instead, they now claim that they have a cause of action under § 220 of the Public Act.

Plaintiffs did not clearly allege a violation of state law as a basis for relief in their complaint.  In Count V Plaintiffs alleged that "42 U.S.C. § 604(a) (and state law applying § 604(a)) prohibit government entities from requiring faith-based providers to alter their religious practices or nature as a condition of receiving youth placed by FIA."  (Compl. at 24, ¶ 1). "Therefore FIA's refusal to lift its unlawful moratorium on new placements at Teen

Ranch violates the statutory right to its religious nature and practices protected by 42 U.S.C. § 604(a)."  (Compl. at 24, ¶ 5).

The only reference to the state law is found in the parenthetical in paragraph 1 of Count V.  This parenthetical reference is not sufficient to place the State on notice that it is being sued for a violation of State law.  Moreover, to the extent Plaintiffs are suing for prospective injunctive relief, their claims are against the State Defendants in their official capacities and are governed by the Eleventh Amendment.  This Court cannot consider a claim for injunctive relief for violation of § 220 of the Public Act because the Eleventh Amendment prohibits federal courts from enjoining state officials for violations of state law. *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).  *See also Freeman v. Michigan Dept. of State*, 808 F.2d 1174, 1179-80 (6th Cir. 1987).

Even if a state law claim for damages had been properly pled, the Court declines to exercise supplement jurisdiction over the damages claim because the Court has dismissed all of the federal claims over which it had original jurisdiction.  28 U.S.C. § 1367(c)(3).  *See also Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) (noting that when all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims).

## IX.

All of Plaintiffs' claims are rooted in their assertion that any youth who go to Teen Ranch are there as a matter of private choice, that there is accordingly no direct funding of

Teen Ranch's religious practices by the State, and that the State is accordingly prohibited by the Public Act from conditioning its funding of Teen Ranch on the modification or elimination of Teen Ranch's practice and expression of its religious beliefs. Because this Court has determined that the ability to opt out of placement at Teen Ranch is not sufficient to constitute private choice, the Court concludes that the State is entitled to a judgment that its moratorium against further placements at Teen Ranch does not violate any of Teen Ranch's constitutional rights. The Court will accordingly grant the State Defendants' motion for summary judgment, deny Teen Ranch's cross-motion for summary judgment, and enter a judgment in favor of the State Defendants.

An order and judgment consistent with this opinion will be entered.

Date:    September 29, 2005          /s/ Robert Holmes Bell
                                    ROBERT HOLMES BELL
                                    CHIEF UNITED STATES DISTRICT JUDGE